**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA, ex rel LUJEAN JENNINGS, M.D.,** | **FILED UNDER SEAL AS REQUIRED BY 31 U.S.C. § 3730** |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO.** |
| **MOUNT ST. MARY'S HOSPITAL, CATHOLIC HEALTH SYSTEM, and LEE RUOTSI, M.D.** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## COMPLAINT

Plaintiff-Relator, LuJean Jennings, M.D. ("Plaintiff") through her attorneys, brings this false claims complaint against Defendants, Mount St. Mary's Hospital ("MSM"), Catholic Health System ("CHS") and Lee Ruotsi, M.D. (collectively "Defendants").

## NATURE OF THE CASE

1. Plaintiff's case arises from Defendants' violation of the False Claims Act, 31 U.S.C. §3729 et seq and the Federal Anti-Kickback Statute 42 U.S.C.§ 1320 a.-7(b).

2. Qui Tam Relator, LuJean Jennings, M.D. brings this action on her own behalf and on behalf of the United States of American and the State of New York to recover damages and penalties under the False Claims Act and the Federal Anti-Kickback Statute against Defendant Mount St. Mary's Hospital, Catholic Health System and Lee Ruotsi, M.D.

3. Defendants made false submissions and perpetrated a well-orchestrated fraud upon the Medicare and Medicaid Program that led to false and/or fraudulent claims for payment

1

being made upon and being paid by the United States Government.

## JURISDICTION AND VENUE

4. This Court maintains jurisdiction under 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732.

5. Venue is proper in the Western District of New York under 28 U.S.C. §§ 1391(b) and (c) and 31 U.S.C. § 3732 because the Defendants conduct business in this district and committed fraudulent acts in this district and possibly other districts.

6. This action is filed *in camera* and under seal pursuant to the requirements of 31 U.S.C §§ 3729 and 3730(b), and is to remain under seal for a period of at least sixty (60) days and shall not be served on the Defendant until the Court so orders. The Government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence and information.

## PARTIES

7. Defendant, Catholic Health System is a non-profit healthcare system in Western New York. Defendant provides medical services through hospitals, treatment centers and other facilities. Defendant currently manages over 30 facilities in Western New York.

8. Among these 30 facilities are 5 hospitals, including Mount St. Mary's Hospital located in Lewiston, New York.

9. Mount St. Mary's Hospital (the "Hospital" or "MSM") is a medical and surgical facility that provides twenty-four-hour medical care and is located at 5300 Military Road, Lewiston, NY 14092.

10. The Hospital is a 175-bed care facility with a full service 24/7 emergency department.

11. Gary Tucker has been the CEO and President of Mount St. Mary's Hospital since it joined the Catholic Health Systems in July of 2015.

2

12. Lee Ruotsi, M.D. is the Medical Director of the Wound Center at the Hospital as well as the Director of two additional Catholic Health System Wound Centers.

13. Plaintiff-Relator Dr. LuJean Jennings is a citizen and resident of the State of New York. Dr. Jennings is a board-certified General Surgeon, licensed to practice medicine under the laws of New York State. Dr. Jennings began her employment at Mount St. Mary's Hospital in 2013 as a Cardiothoracic, General and Vascular Surgeon. Beginning in 2014, her services for Defendant were also contracted on a per diem basis through Team Health. At MSM she was appointed to the Quality & Patient Safety Committee, Medical Executive Advisory Committee, Ethics Committee, and Emergency Department Committee. At CHS, she was appointed to the Medical Executive Committee, the Credentials Committee and the Ad Hoc CTS Chair Selection Committee. On January 1, 2017, Plaintiff-Relator became the Facility Medical Director for the hospitalist group. On or about July 28, 2017, following Plaintiff's objections to improper upcoding at Defendant, Dr. Jennings was demoted from Medical Director to a Staff Hospitalist. Her employment was terminated on February 13, 2018, again after objecting to improper upcoding, with the termination to be effective 90 days thereafter.

14. As required under the Act, the Relator has furnished to the Attorney General of the United States and to the United States Attorney for the Western District of New York simultaneous with or prior to the filing of this Complaint, a statement contained herein of all material evidence and information related to the Complaint. This disclosure statement is set forth in the Complaint, and supports the existence of overcharges and false claims by the Defendants.

3

## BACKGROUND

15. At all times relevant to this action, Defendants perpetuated a fraud against the United States by devising and implementing a scheme in violation of the False Claims Act, 31 U.S.C. §§ 3729 et seq and the Federal Anti-Kickback Statute 42 U.S.C.§ 1320 a.-7(b).

16. During her employment with Defendant Hospital, the Plaintiff-Relator became aware of numerous improper Medicare and Medicaid billing practices.

17. Plaintiff personally observed the improper practices described below and has seen, in the ordinary course of her employment, Hospital records from documenting the violations, including billing records, and patient medical records.

18. Relator is an original source individual, with direct and independent knowledge of the information set forth herein, and she has voluntarily provided the information to the government pursuant to 31 U.S.C. §3730(4)(B).

19. Medicare is a health insurance program that provides health care coverage to people who are 65 years or older, under 65 years and receive Social Security Disability Insurance, or for people who are under 65 years and have End-Stage Renal Disease.

20. Medicare Part A covers Inpatient hospital care, inpatient stays in nursing facilities and hospice and home health services.

21. Medicare Part B covers doctor and clinical lab services, outpatient and preventative care, home health care, screenings and physical and occupational therapy.

22. Medicaid is funded by federal and state health insurance programs and is available to low-income families and/or the disabled.

4

23. In 2015 Medicare & Medicaid Services ("CMS") updated the "Two- Midnight Rule" regarding inpatient and observation admissions.  In general, this rule states:

      (a) Inpatient admissions will generally be payable under Part A if the admitting provider expected the patient to stay at least 2 nights.

      (b) Medicare Part A payment is generally not appropriate for a hospital stay that does not last at least 2 nights.

24. Inpatient stays are billed at a rate that is based on Diagnosis Related Groups ("DRG") and is reimbursed much higher than a hospital observation admission.

25. Observation stays are typically less than two midnights and are paid under the Medicare Part B Program.

26. There are guidelines to help physicians determine whether the patient should be admitted as inpatient or observation, but ultimately the determination is made by the treating physician and the two-midnight rule.  Just because a patient meets arbitrary hospital inpatient criteria, it does not mean that the patient should be automatically be admitted as inpatient and billed as such.

27. The treating Physician determines the level of health care necessary and whether or not the severity of the illness and necessary medical services warrant an inpatient setting.  If the initial designation process turns out to be inappropriate, the physician can change the designation to reflect reality.

**DEFENDANT'S ACTS**

28. Applicable regulations require that the information provided in relation to claims for Medicare payments, including Medicare cost reports, filed yearly for each facility, must

be true, accurate and complete.  Nonetheless, Defendants, in violation of applicable Medicare regulations, knowingly and regularly sought and received Medicare payments for patients in excess of that for which payments were due.

29. The false claims can be generally described in the following categories:

    (a) overbilling due to upcoding observation admissions to inpatient admissions, resulting in higher paying DRGs;

    (b) double billing due to hospital and contractor billing for surgical perioperative services for which surgeons were already paid to perform at MSM under the Global Surgical Package; and

    (c) overbilling and over prescribing of more expensive medications that are not medically necessary and/or treatments for the benefit of Defendants and pharmaceutical companies that have financially incentivized Defendant Lee Ruotsi, M.D.

### Upcoding Observation Admission to Inpatient Admission

30. Plaintiff, along with other physicians, were required to change the coding of observation stays to inpatient stays even if the patient did not stay the two-night minimum in order to increase the Hospital's reimbursement rate.

31. Most cases that were claimed to have met the inpatient criteria were discharged before the 2-night minimum and should have been billed as observation only under Part B and not Part A.

32. The amount billed for inpatient is much higher than those for observation.

33. For example, in 2013, a 3-day hospitalization for syncope for Inpatient was $3,926 and for Observation it was only $1,489.  Medicare would be billed $2,437 more for Inpatient status as it would be for an Observation status.

34. According to the Office of the Inspector General, "on average, Medicare paid nearly three times more for a short inpatient stay than an observation stay and beneficiaries paid almost two times more".

35. If a patient is admitted for observation and then found to meet criteria for inpatient, it can be appropriately changed.  This is a decision for the physician, not billing/coding department workers and should be based on the severity of the illness, not whether the patient meets arbitrary hospital mandated criteria.

36. Similarly, a patient admitted as inpatient, but later found not to need extended hospitalization should be downcoded to observation.  Code 44 is the procedure to change an inpatient to observation.  This was only used **once** at Mount St. Mary's during 2017.  This process requires a verbal notice to the patient.

37. In 2016, 41% of Observation admissions were converted to Inpatient.  Of those, 45% stayed less than two midnights.

38. Between January 2017 and August 2017, out of 889 Observation admissions, 314 were changed to Inpatient.  45% percent of those admissions stayed less than 24 hours.

39. Between January 2017 and July 2017, the total inpatient admissions were 2202 and the total observation admissions were only 473.

40. Between January and August 2017, 84% of one-day hospitalizations were claimed to meet inpatient criteria.

41. Any questioning by medical staff of directives from billing/coding department escalated all the way up to the CEO who pressured the physician to upcode.

42. Almost every observation admission was targeted for upcoding within hours of admission.

43. In some cases, non-physician resource management staff made unauthorized EMR (electronic medical records) entries concerning admission status changes.

44. Observation admissions were also cancelled so that a new inpatient admission order could be made.

45. For a period of time, electronic orders to admit as observational status would automatically convert to an electronic inpatient order.

46. The Utilization Review Staff ("UR") responsibilities include checking inpatient charts to confirm they are appropriate for admission under inpatient status.

47. Ms. Chantel Huff Michel is part of the Hospital's UR staff.

48. CMS directs that the Certification of inpatient services may only be made by a physician who is a doctor of medicine or osteopathy, a dentist (under specific circumstances), or a podiatrist (under specific circumstances).  At the Hospital, nurses, midlevels and locums doctors are improperly directed by the UR staff to enter an order to convert to Inpatient status on Observation patients.  The UR staff themselves also enter such orders.  Once that happens, as of a September 6, 2017 Hospital directive, the patient cannot be discharged unless a physician cosigns the inpatient admit order.

49. Specific examples of recent false claims made by Defendants MSM and CHS include:

    (a) On July 3, 2017, Chantel Huff Michel changed a patient's status to inpatient without a doctor's order.  Ms. Huff Michel is not a physician

and thus not authorized to change an admission order.  Plaintiff
complained to Margaret Gabriele, Manager of Care Management and
Anthony Cumbo, Hospital Medical Director, by e-mail but was told by
Gary Tucker, CEO, to "work it out offline".  This was never worked out
because Dr. Cumbo and Ms. Gabriele refused to meet with Plaintiff-
Relator.

(b) On July 4, 2017, Ms. Huff Michel entered the "Change to Inpatient
Status" order on a patient without authorization from a doctor.

(c) On July 6, 2017, Plaintiff-Relator admitted a patient as observation.  Ms.
Huff Michel's notes state that the patient met inpatient criteria due to
lower extremity cellulitis with warmth and erythema notes.  The patient
was discharged the next day.  There was no Code 44 adjustment made.

(d) On July 25, 2017, Plaintiff-Relator down coded a patient from inpatient
to observation and was reprimanded.  Ms. Gabriele told Plaintiff-Relator
not to down code a patient again and that she would handle those
situations in the future.

(e) On July 31, 2017, Ms. Huff Michel e-mailed Dr. Budder Siddiqui stating
that a patient in observation meets criteria for inpatient.  Dr. Siddiqui
then emailed Plaintiff-Relator and instructed her to change that patient's
status from observation to inpatient.

(f) On September 6, 2017, a memorandum was sent out by Dr. Cumbo,
announcing the EMR hard stop tool.  Meaning, if a midlevel or nurse
change the patient's status to inpatient status, the patient could not be

discharged until the doctor co-signed the "change to Inpatient Status Order". If the order was not co-signed, the computer automatically rejected the discharge order. This puts the physician in a no-win situation, basically forcing them to sign the inpatient order.

(g) On September 15, 2017, Ms. Huff Michel told Dr. Khan to change a patient to inpatient status and the patient was discharged that same day. There was no Code 44 adjustment made.

(h) On September 16, 2017, a patient was admitted by a mid-level as inpatient but the patient was discharged the same day. There was no Code 44 adjustment made.

(i) That same day, another patient was admitted as observation and again Ms. Huff Michel claimed that the patient met inpatient criteria due to increasing weakness, sickness and weight loss. The patient was changed to inpatient status but was discharged the next day. There was no Code 44 adjustment made. Plaintiff-Relator had a conversation with Dr. Khan via text message regarding the fact that on one day Ms. Huff Michel asked Dr. Khan to change the status on five patients from observation to inpatient.

(j) On September 23, 2017, a patient was changed from observation to inpatient but was discharged the next day. No Code 44 adjustment was made.

(k) On October 21, 2017, Dr. Khan admitted a patient as observation. Ms. Huff Michel left Dr. Khan a note state that the patient "meets IP

10

criteria".  Dr. Khan cancelled that order and readmitted the patient as inpatient.

(l) On December 22, 2017, Ms. Huff Michel instructed Giovanna Plouffe, Nurse Practitioner, to enter a "change to inpatient order".  Ms. Plouffe could then not discharge the patient until Plaintiff-Relator co-signed the order.

(m) On January 16-17, and January 25, 2018, Plaintiff-Relator discussed patients with Hospital-employed Physician Advisor, Dr. Siddiqui.  Dr. Siddiqui directed Plaintiff-Relator to change patients from observation status to inpatient, including one patient who was not even a hospitalist patient.  Plaintiff-Relator told Dr. Siddiqui that the private doctor was responsible for that patient and the hospitalist's patient did not warrant inpatient status.  Dr. Siddiqui responded that Ms. Huff Michel was still hoping the patient's status would be switched.

(n) On February 19, 2018, Ms. Huff Michel directed Plaintiff-Relator to change the status of eight patients to inpatient status.

50. Plaintiff-Relator brought her concerns to the attention of her Supervisor only to be disregarded, then demoted and then fired.

<u>Surgeries at Mount St. Mary's</u>

51. CMS pays surgeons (in connection with performing the majority of surgeries) a Global Surgical Package payment which includes payment for preoperative evaluation and preparation on the day prior to surgery, for the surgery itself, and for postoperative care for 90 days after surgery.  Instead of the surgeons doing preoperative and postoperative

11

care, the Hospital relieves the majority of surgeons of these duties and has the hospitalist service perform pre- and post-operative care in the place of the surgeon. The Hospital then recovers technical fees for the surgery and professional fees for its employed surgeons, which it is entitled to, but a second physician also bills Medicare/Medicaid for performing the pre- and post-operative care the surgeon was paid to perform under CMS's Global Package. Therefore, Medicare/Medicaid is double-billed. When Relator Jennings questioned CEO Tucker about this practice, he replied that taking away much of the surgeons' work was an incentive for them to bring their elective surgeries to the Hospital, rather than to an alternate hospital.

Wound Clinic

52. The Hospital operates an accredited wound healing and hyperbaric medicine center.

53. This center provides treatments and therapies for patients with chronic and hard-to-heal wounds. Treatments offered at this center include, individualized wound dressing, debridement, bioengineered skin and tissue replacement, compression wrapping, electrical stimulation, hyperbaric oxygen therapy and transcutaneous oxygen testing.

54. The Hospital's Wound Center has three hyperbaric chambers. Patients are treated in chambers even when such treatment is unnecessary, including, for example, after a wound is fully healed or when it is not responding to the treatment. This exposes the patient to a risk of side effects for no medical reason and at an unnecessary cost to Medicaid/Medicare.

55. Wounds are measured and photographed at each visit. The protocol is that wound treatments stop after 30 days if the wound is not responding to treatment. However, patients get expensive hyperbaric treatments beyond that. Not only is that exposing those

patients to risk of seizures, collapsed lungs and heart failure, but Medicare/Medicaid is billed for expensive unnecessary treatment.

56.  The Wound Center Director receives approximately $80,000 per year from wound product pharmaceutical companies.  The Wound Center prescribes more expensive medications with higher payments by Medicare/Medicaid.

<u>Retaliation</u>

57. Plaintiff-Relator made many complaints regarding the improper coding and billing at Defendant.

58. Plaintiff- Relator was brushed off and told by CEO Tucker to "work it out offline" when she complained to Medical Director, Thomas Cumbo and Director of Care Management, Margaret Gabriele.

59. Plaintiff- Relator was subjected to retaliation in connection with her complaints when she was demoted to Staff Hospitalist on July 28, 2017.

60. Most recently, on or about February 5, 2018, Ms. Huff Michel presented Plaintiff-Relator with a list of ten patients she wanted Plaintiff-Relator to upcode.  Plaintiff-Relator told Ms. Huff Michel that she would look at the charts.  Ms. Huff Michel stated that the "orders need to get done now".  Plaintiff-Relator told Ms. Huff Michel that she could not put the orders in until she evaluated the charts and patients.  She explained that there are rules and regulations and that Plaintiff-Relator did not want to commit fraud.

61. After reviewing the charts, Plaintiff-Relator found only two out of ten patients were appropriate to be changed to inpatient.  Plaintiff-Relator gave this list to Dr. Ahmed and explained to him what happened.  He said he would take care of it.

62. On or about February 7, 2018, after Plaintiff- Relator's team meeting, she was approached by her Supervisor, Dr. Ahmed.  He asked if Plaintiff-Relator accused the discharge planner of committing fraud.  Plaintiff-Relator told him that she did not and the only time she mentioned fraud was when she was talking to Ms. Huff Michel about wanting to evaluate charts before changing status.

63. On or about February 10, 2018, Plaintiff was called to the ER to admit a woman who tripped and fell on her knee at home. This patient had extensive ER workup, including x-rays and CT scans that showed there was nothing wrong with her leg other than a bruise. Plaintiff-Relator told the ER doctor that the patient did not need to be admitted for a bruised knee and that the patient wanted at home services anyway.  The ER doctor told Plaintiff-Relator that home services could not be arranged on the weekend and that she would need to be admitted. Plaintiff-Relator told him that was incorrect and directed him to call the social worker.  A RN from McCauley Seton Home Care Liaison confirmed that these services could be arranged.  Plaintiff-Relator admitted the patient as observation and another doctor subsequently converted her to inpatient status.

64. In fact, an orthopedic surgeon had already evaluated that patient and confirmed she only had a bruise on her knee and he could see her in his office in two weeks.  He also said that there was no need for further workup or intervention.  This patient should not have been upcoded to inpatient status.

65. Three days later, on February 13, 2018, Plaintiff's employment was terminated.  She received a termination letter that stated "Exigence Hospitalist Medical Services of Lewiston, PLLC is terminating your Medical Professional Employment Agreement dated July 29, 2017 without cause."

14

66. TeamHealth's Regional V.P. DeCarlo conferenced called Plaintiff-Relator on that same day and informed her that she wasn't the right fit for what they were trying to do to grow into the future.

67. Dr. Ahmed confirmed to Plaintiff-Relator that the Hospital and Team Health were aware of and were discussing the upcoding issues at the same time they discussed Plaintiff-Relator's termination with him.

68. Plaintiff-Relator's last two employment evaluations were positive. In fact, her most recent evaluation was less than a week before her termination and did not mention her poor fit that was alleged by Ms. DeCarlo.

69. Upon information and belief, Plaintiff-Relator was terminated due to the fact that she would not upcode patients that were inappropriate to be converted to inpatient.

## COUNT I

## FALSE CLAIMS ACT VIOLATION - 31 U.S.C. § 3729(a)(1) & (2)

70. Paragraphs 1 through 69 above are incorporated herein by reference.

71. Defendants knowingly caused to be presented false or fraudulent claims against the Federal Medicare/Medicaid Programs.

72. Defendants made and used false and fraudulent statements or caused false and fraudulent statements to be made or used for the purpose of aiding in the obtaining of improper Medicare reimbursements.  These claims were fraudulent for the various reasons set forth in this Complaint.

73. At all relevant times, Defendants knew that the charges to Medicare were not legitimate or authorized by the Medicare Act.

74. Defendants have submitted thousands of fraudulent claims resulting in millions of dollars

in overpayments.  Based upon the statutory civil penalty of five thousand dollars ($5,000.00) to ten thousand dollars ($10,000.00) for each false claim submitted, and the treble damages applied to the amount of the overpayments, Plaintiff-Relator estimates the total amount to be recovered from Defendants is in excess of ten million dollars, depending upon the actual numbers of patients for whom Defendants have submitted false billings to the government.

75. The government of the United States has made and will make payment upon false and fraudulent claims and thereby suffer damages.  The United States is entitled to full recovery of the amount paid by the Medicare and Medicaid Programs pursuant to the submission of false claim which Defendants caused to be submitted.

76. Plaintiff-Relator believes and avers that she is an original source of the facts and information on which this action is based.

## COUNT II

## RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT - 31 U.S.C. § 3729(a)(1) & (2)

77. Paragraphs 1 through 69 above are incorporated herein by reference.

78. Defendants subjected Plaintiff-Relator to retaliation for having engaged in protected action.

79. As a direct result of Defendants' acts set forth herein against Plaintiff-Relator, Plaintiff-Relator has lost past and future wages and other employment benefits, and has suffered damage to her reputation and severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

80. Defendants' conduct was outrageous, was done in a deliberate and malicious manner intended to injure Plaintiff-Relator and was done in conscious disregard to Plaintiff-Relator's rights. Therefore, Plaintiff-Relator is entitled to an award of punitive damages.

## COUNT III

### VIOLATIONS OF THE FEDERAL ANTI-KICKBACK STATUTE

### 42 U.S.C.§ 1320 a.-7(b)

81. Paragraphs 1 through 69 above are incorporated herein by reference.

82. The pharmaceutical kickbacks to Dr. Lee Ruotsi violate the federal Anti-Kickback Statute.

83. These kickbacks induced more expensive medications/treatments with higher payment by Medicare/Medicaid.

84. The estimated incentives to Defendant Ruotsi were in excess of $80,000.

85. For each of these violations, Defendants can be subjected to penalties of $50,000 for each violation, plus damages of up to three times the amount of the improper payment.

86. Plaintiff-Relator believes and avers that she is an original source of the facts and information on which this action is based.

87. **WHEREFORE,** Plaintiff-Relator, on behalf of herself and the United States government, requests the following relief:

   (a) Judgment against the Defendant in the amount of three (3) times the amount of damages the United States of America has sustained.

   (b)  A civil penalty of not less than $5,000.00 and not more than $10,000.00 for each action in violation of 31 U.S.C. 3729 and the appropriate fines and penalties for violating the protective federal laws applicable to the

17

fraudulent and false conduct and the cost of this action with interest.

(c) Civil penalties of up to $50,000 each kickback violation.

(d) That the Plaintiff-Relator be awarded all costs incurred, including

reasonable attorney's fees.

(e) In the event that the United States proceeds with this action, Plaintiff-

Relator be awarded the maximum amount allowed for Qui Tam Relators

under 31 U.S.C. § 3730 (d) and/or other applicable provision of law.

(f) Defendant be enjoined and restrained from harassing or discriminating

against Plaintiff-Relator.

(g) Such other relief as this Court deems just and appropriate.

DATED: Cheektowaga, New York
February 27, 2018

Respectfully submitted,

Harvey P. Sanders, Esq.
Sanders & Sanders
401 Maryvale Drive
Cheektowaga, NY 14225
(716) 839-1489

18